# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR16-0051-LTS |
| vs. | **ORDER** |
| LANCE LAPAE MONDEN, STANLEY EARL MOSLEY, JR., and KATHERINE AMANDA PIHL, | |
| Defendants. | |

This matter is before me on a Report and Recommendation (R&R) in which the Honorable Jon Stuart Scoles, Chief United States Magistrate Judge, recommends that I deny defendants' motions to suppress. *See* Doc. No. 56.

## I. BACKGROUND

### A. *Procedural History*

On June 8, 2016, the grand jury returned an indictment (Doc. No. 4) against defendants Lance Monden, Earl Mosley, Jr., and Katherine Pihl charging them with one count of bank robbery and aiding and abetting in violation of 18 U.S.C. §§ 2113(a) and 2. Mosley filed his motion to suppress (Doc. No. 40) on July 7, 2016, Monden filed his (Doc. No. 43) on July 8, 2016, and Pihl filed hers (Doc. No. 47) on July 13, 2016. The Government filed a resistance (Doc. No. 51) on July 14, 2016. Judge Scoles held a hearing on July 18, 2016. During that hearing, Government Exhibits 1 through 11 were admitted into evidence, along with Monden's exhibits A through D.

Judge Scoles issued his R&R on July 29, 2016. Mosley filed objections (Doc. No. 69) to the R&R on August 10, 2016. Monden filed objections (Doc. No. 85) on

August 12, 2016. Pihl did not file objections. As such, any objections by Pihl are now deemed waived. *See* N.D. Ia. L.R. 72.[1]

B.  *Relevant Facts*

I find no error with regard to Judge Scoles' detailed statement of facts and, therefore, adopt it in its entirety. The relevant facts may be summarized as follows:

On May 20, 2016, four men driving in a pickup truck saw two men wearing gray hooded sweatshirts running from Palo Savings Bank in Palo, Iowa. Finding this suspicious, the men drove around the block to return to the bank. They also called the bank. A bank employee reported that the bank had just been robbed and had called 911. The witnesses described seeing the men in the hooded sweatshirts and stayed on the phone with the bank employee while the employee spoke to the 911 dispatcher. The employee confirmed that the bank had been robbed by two individuals who were wearing gray hooded sweatshirts and black masks and reported that at least one of the subjects was African American.

When the men in the pickup truck returned to the bank, they no longer saw the men in hooded sweatshirts. However, they did observe a gray Ford Taurus leaving the area and followed it. They reported that the Taurus was heading south on Highway 94 toward Cedar Rapids.

Linn County Deputy Sheriff James Uher was on duty and received the dispatch to look for a gray Ford Taurus heading south on Highway 94. He spotted the vehicle and stopped it. He spoke to the female driver and observed no one else in the vehicle. While Uher was speaking with the driver, dispatch was informed the men in the truck did not think the Taurus was involved, as they had observed only a female driver in the vehicle and no one else. Dispatch communicated this to Uher and Uher told the driver she could

---

[1] All three defendants have now entered conditional pleas of guilty. *See* Doc. Nos. 88, 92, 93.

go. However, another deputy then came on the radio and suggested Uher get additional information regarding where the driver was coming from and where she was going. As the vehicle was slowly pulling away, Uher walked toward it and the driver stopped again. Uher asked for her information. She did not have her driver's license, but identified herself as Katherine Pihl.

During this time, two additional law enforcement officers arrived. Dispatch also communicated that the witnesses had not actually seen the men in hooded sweatshirts enter the Taurus. As Uher was preparing to let Pihl leave for the second time, another deputy came over the radio and advised Uher to "check the trunk real quick." Uher said something to the effect of either "hey, pop the trunk of your car" or "hey, would you pop the trunk of your car."[2] Pihl did not say anything, but opened the trunk. Uher and the other officers walked to the back of the vehicle and found two men in gray hooded sweatshirts in the trunk, along with a backpack and cash. The men were identified as Lance Monden and Stanley Mosley, Jr.

## II. STANDARD OF REVIEW

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

---

[2] *See* Doc. No. 86 at 26.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

### III. DISCUSSION

Defendants make four arguments challenging the legality of the seizure and search of the vehicle:

1. The stop was made without reasonable suspicion of criminal activity.

2. The duration of the stop exceeded the length of time required to complete the stop's mission.

3. The search of the trunk was not supported by probable cause and did not fall under any exception to the warrant requirement.

4. A subsequent search warrant was fruit of the poisonous tree.

4

*See* Doc. Nos. 40, 43 and 47. Judge Scoles addressed each argument in his R&R. He also considered (a) whether Monden and Mosley have standing to challenge the vehicle stop and (b) whether any defendant has standing to challenge the search of the trunk.[3]

Monden and Mosley object to Judge Scoles' findings on the first and second issues. As such, I will review those issues de novo and will review the remaining issues for clear error.

### A. *Was There Reasonable Suspicion to Initiate the Traffic Stop?*

Judge Scoles concluded that Uher had reasonable suspicion of criminal activity to stop the gray Taurus because it was "located in the precise location and traveling in the right direction as one would expect from a gray Taurus reported by witnesses as potentially being involved in the bank robbery seven minutes earlier and six miles away." Doc. No. 56 at 7-8.

Monden objects to this finding arguing that Uher did not have sufficient information to create a reasonable suspicion. He contends that Uher had no information the bank robbers were seen getting into the Taurus or that the Taurus was observed in front of the bank. He argues the mere fact that it was seen leaving the area of the bank after the robbery does not rise to the level of reasonable suspicion. Moreover, Monden argues the witnesses' belief that the vehicle was involved in the crime is irrelevant to the objective inquiry of whether reasonable suspicion existed to stop the vehicle.

Mosley rests his objection on *United States v. Jaquez*, 421 F.3d 338 (5th Cir. 2005). In *Jacquez*, an officer on patrol heard through dispatch that a red vehicle was involved in an exchange of gunfire. *Jacquez*, 421 F.3d at 340. Shortly after this report,

---

[3] Judge Scoles concluded, and I agree, that all three occupants of the vehicle have standing to challenge the stop of the vehicle. Doc. No. 56 at 6. I will address defendants' standing to challenge the search of the trunk in Section III(C), *infra*.

5

the officer observed a red car traveling away from the area where the shots were reported to have been fired. *Id.* The officer pulled over the vehicle and asked the driver whether he had any weapons. He said he did not and consented to a search of the vehicle. While escorting the driver to her vehicle to detain him, the driver admitted there was a loaded firearm under the driver's seat. *Id.* He was arrested and charged with unlawful possession of a firearm. *Id.* The Fifth Circuit concluded the officer did not have a reasonable suspicion to make an investigative stop of the vehicle because the officer only knew that a red vehicle was involved in an incident 15 minutes earlier in the same general area where she spotted the car. *Id.* at 341. Moreover, she only knew the color of a vehicle, not its make, model, or a description of its occupants. *Id.* For this reason, it included the sparse and broadly generic information from the dispatcher, without more, was insufficient to amount to reasonable suspicion. *Id.*

Mosley argues the same reasoning should apply to this case because Uher did not know who was driving the vehicle when he stopped it, but did know he was looking for a vehicle with two males, one of whom was African American. According to Mosley, the fact that the gray Taurus was being driven by a white female was enough to remove any suspicion that could have existed. He also points out that in *Jacquez*, it was known that a red vehicle was actually involved in the incident, while in this case there was no such certainty as to the gray Ford Taurus. Mosley acknowledges that Uher knew the make and model of the vehicle that may have been involved in the robbery. However, he contends the other two factors should be given greater weight.

The *Jaquez* court considered *United States v. Hall*, 557 F.2d 1114 (5th Cir. 1977), in which an officer had slightly more information than the officer in *Jacquez*. In *Hall*, the officer was told to look for a "red 1969 two-door Ford" that was suspected of being involved in a bank robbery. *Hall*, 557 F.2d at 1116. He was also given a description of the three suspects. *Id.* at 1115. Approximately 15 minutes after the dispatch went out, the officer observed a red Ford driving away from the town where the robbery occurred.

6

He stopped the vehicle, spoke to the driver and ran his information. *Id*. at 1116. The Court concluded the officer had reasonable suspicion to make the initial stop, noting that the timing and location of the vehicle were the most important factors. *Id*. at 1117.

"[A]n investigatory stop is permissible under the Fourth Amendment if supported by reasonable suspicion that the person stopped is involved in criminal activity." *See United States v. Arnold*, ___ F.3d ___, 2016 WL 4536553, at *3 (8th Cir. Aug. 31, 2016) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). In evaluating the validity of a traffic stop, the court must consider "the totality of the circumstances – the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981). The "collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers." *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008).

"Reasonable suspicion exists when an 'officer is aware of particularized objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.'" *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (quoting *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012)). "While reasonable suspicion must be more than an inchoate hunch, the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004) (internal quotations omitted). The level of suspicion required for a *Terry* stop is less demanding than that for probable cause. *United States v. Sokolow*, 490 U.S.1, 7 (1989).

Here, Uher had information regarding the color, make and model of the vehicle suspected to have been involved in the robbery, as well as the direction it was traveling. *See* Doc. No. 86 at 11-12, 27 (in which Uher testifies he heard from dispatch that a gray Ford Taurus was potentially involved in a bank robbery in Palo, Iowa, and was headed

7

south on Highway 94).⁴ The Eighth Circuit has found reasonable suspicion under similar circumstances. *See United States v. Juvenile TK*, 134 F.3d 899, 900-01 (8th Cir. 1998) (concluding that officer had reasonable suspicion to stop vehicle based on "the temporal and geographic proximity of the car to the scene of the crime, the matching description of the vehicle, and the time of the stop."); *United States v. Witt*, 494 F. App'x 713, 716 (8th Cir. 2012) (finding officer had reasonable suspicion to stop vehicle because vehicle matched description from dispatch, was the only vehicle he had seen that matched description, it was traveling away from city where bank had been robbed and was stopped approximately 50 to 60 miles away from bank that had been robbed an hour earlier); *United States v. Vinson*, 805 F.3d 1150, 1152 (8th Cir. 2015) (finding officer had reasonable suspicion to stop vehicle because it matched the description and direction the suspect vehicle was traveling). The issue raised by both defendants, however, is whether Uher and other officers had enough information to suspect the gray Ford Taurus in the first place, given that no witness saw the suspects enter that vehicle.

The witnesses reported seeing the suspects running southeast away from the bank. Doc. No. 86 at 38. They drove around the block and came back towards the bank. As they were nearing the bank the second time, they saw a gray Ford Taurus take a left from the road immediately south of the bank and head south toward Highway 94. Doc. No. 86 at 38-43. *See also* Doc. No. 51-2 (providing map of area surrounding bank). The Taurus was the only vehicle the witnesses saw in the area south of the bank. Doc. No. 86 at 43. The Eighth Circuit has found reasonable suspicion to stop a vehicle even when the vehicle has only been seen leaving the area where a crime occurred. *See United*

---

⁴ He also had a description of the suspects, but it is not clear from the record whether he was able to tell what the driver looked like before he stopped the Taurus. *See* Gov. Ex. 3 (in which dispatch can be heard providing a description of two men wearing gray hoodies and black masks, one of whom was a black male); Doc. No. 51-5 (in which Uher explains in his police report that dispatch put out a call of a bank robbery in Palo with the suspects being described as two black males wearing masks).

*States v. Roberts*, 787 F.3d 1204, 1207-11 (8th Cir. 2015) ("It is not surprising that moments after the shooting, the police were unsure of the precise role the black Chrysler may have played. And in light of this brief time frame, it was reasonable for Officer Lesedi to stop a car matching the description of the car that witnesses had seen fleeing the scene of the crime."). Therefore, the fact that the witnesses did not see the men in hooded sweatshirts enter the gray Ford Taurus does not foreclose a finding of reasonable suspicion based on other factors.

Based on the totality of circumstances, I find Uher had reasonable suspicion to initiate a stop of the gray Ford Taurus. The witnesses told law enforcement it was the only vehicle they saw leaving the area shortly after they saw the two men running away from the bank. Uher also spotted the vehicle at a time and place close to the robbery and traveling in the direction and on the road provided by the witnesses. Given all of these factors, I find that the vehicle stop was lawful.

### B.     *Was The Length of The Stop Excessive?*

Judge Scoles determined the length of the traffic stop was not excessive. He noted the stop lasted a total of three and a half minutes. Moreover, he reasoned that the "mission" of the investigatory stop was to determine whether the vehicle had been involved in the recent bank robbery. Judge Scoles found that at no point prior to the opening of the trunk was the mission definitively completed such that Uher was required to permit the vehicle to leave. He also found that Uher's reliance on other deputies in completing the "mission" was inconsequential.

Monden argues that once the vehicle was stopped and Uher had no indication it was involved in the robbery, he should have let it go. He notes that the driver did nothing suspicious, but provided the requested information and cooperated with law enforcement. He contends the investigatory stop should have ceased upon completion of these cursory details, which gave no indication of wrongdoing. Essentially, Monden argues the

9

reasonable suspicion dissipated during the stop and Uher should not have been permitted to continue investigating when no apparent connection existed to the robbery based on Uher's initial contact with Pihl.

"A brief stop of a suspicious individual, in order to determine his [or her] identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams*, 407 U.S. 143, 145 (1972). "In determining whether an investigatory detention is reasonable, we consider 'the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.'" *Williams v. Decker*, 767 F.3d 734, 741 (8th Cir. 2014) (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)). The investigation must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. "[A]n investigative stop must cease once reasonable suspicion or probable cause dissipates." *United States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993).

As noted above, Uher had reasonable suspicion to stop the gray Ford Taurus based on the information from dispatch that the vehicle may have been involved in a bank robbery just minutes earlier and a short a distance away. The purpose of Uher's stop was to determine whether the vehicle was involved, not just the driver. Even though Pihl did not provide any information to suggest the vehicle was involved, Uher's search of the trunk was within the scope of his mission to determine the vehicle's potential involvement. It was one of a few areas in the car that Uher could not see and that could have potentially been carrying evidence of the crime being investigated.

Citing *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), Mosley argues Uher had no basis to extend the stop once his observation of the vehicle and conversation with Pihl provided no connection to the robbery. In *Rodriguez*, a vehicle was pulled over after an officer observed it driving on the highway shoulder. The officer gathered the driver's information and ran a records check back in his patrol car. *Rodriguez*, 135 S.

10

Ct. at 1613. He returned to the vehicle and asked for the passenger's driver's license. He also asked where they were going and where they were coming from. *Id.* The officer returned to his patrol car, ran a records check on the passenger and called for a second officer. *Id.* He then wrote the driver a warning for driving on the side of the road. After returning all the information to the driver and passenger and giving them the warning, the officer asked if he could walk his dog around the vehicle. The driver declined. *Id.* The driver was ordered out of the vehicle and a dog sniff led to the discovery of methamphetamine in the vehicle. *Id.* The Court held "that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* at 1612. The case was remanded to the Eighth Circuit to consider whether reasonable suspicion existed to detain the driver beyond completion of the traffic infraction investigation. *Id.* at 1616.[5]

This is not a traffic violation case. When a vehicle is pulled over for a traffic violation, the officer may verify the driver's information, do a records check of the driver and the vehicle, and issue a warning or citation. Unless reasonable suspicion arises during the course of these activities, the investigation is completed and the vehicle must be released. *See United States v. White*, 81 F.3d 775, 778 (8th Cir. 1996) (noting that a traffic stop ends when officer has completed tasks of verifying license and registration, asking driver about his destination and purpose, and running a computer check for outstanding warrants or stolen vehicles and returns paperwork to driving with ticket or warning). The purpose of Uher's stop was much broader than addressing a traffic violation. Uher's mission was to determine whether the vehicle had been involved in a

---

[5] The Eighth Circuit concluded the search was not unreasonable because under the appellate precedent at the time, a brief delay to employ a drug dog during a traffic stop was not an unconstitutional seizure. *See United States v. Rodriguez*, 799 F.3d 1222, 1223-24 (8th Cir. 2015) (citing *Davis v. United States*, 131 S. Ct. 2419, 2423-24 (2011) for the proposition that searches which rely on binding appellate precedent are not subject to the exclusionary rule).

bank robbery. A search of the trunk fell within the scope of that mission. This conduct fits squarely within the holding of *Rodriguez* because the stop did not exceed the time needed to "handle the matter for which the stop was made." *Rodriguez*, 135 S. Ct. at 1612. I find that the length of the traffic stop was not excessive.

## C. *Do Defendants Have Standing to Challenge the Search of the Trunk?*

Judge Scoles found the defendants lack standing[6] to challenge the legality of the trunk search. Nonetheless, he went on to analyze the legality of the search in the event that I find standing. Because I agree that defendants must demonstrate standing in order to challenge the legality of the search, I will analyze that issue first.[7]

"Fourth Amendment rights are personal rights that may not be asserted vicariously." *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004). Whether a defendant has "standing" to assert a Fourth Amendment claim depends on whether that defendant had a reasonable expectation of privacy in the thing that was searched. *Id*. "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *Id*. (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)). The following facts are relevant to the determination of standing:

> ownership, possession and/or control of the area searched or items seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

---

[6] I agree with Judge Scoles' analysis that standing in this context refers to a reasonable expectation of privacy in the property to be searched. *See* Doc. No. 56 at n.8.

[7] No defendant has objected to Judge Scoles' finding that all of the defendants lack standing to challenge the search of the truck. *See* Doc. Nos. 69, 85.

*Gomez*, 16 F.3d at 256 (citing *United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir. 1991)).

It is undisputed that the vehicle did not belong to any of the defendants. Rather, Monden borrowed it from his friend Cedric Rivers, who had borrowed it with the permission of its owner, Farrah Franklin. *See* Doc. No. 86 at 69, 72-73. The Eighth Circuit has held that a defendant has no reasonable expectation of privacy in a car he does not own and does not have permission to use. *See Gomez*, 16 F.3d at 256. While Monden had permission from Rivers to use the vehicle, he did not have permission from Franklin, the vehicle's owner. Indeed, Franklin had specifically instructed Rivers that Monden was *not* to use her vehicle. *See* Doc. No. 86 at 74. Judge Scoles ultimately found these facts dispositive in concluding defendants did not have standing to challenge the search of the trunk. I find no clear error in this conclusion.

Because the defendants lack standing to challenge the search of the trunk, I need not consider their arguments regarding the legality of that search.

### D. *Fruit of the Poisonous Tree*

Defendants argue that a search warrant obtained after the vehicle was stopped and searched is invalid because it was based on unlawfully-gathered information. However, I have concluded that the vehicle stop was lawful and that the stop did not exceed the length permitted by the Fourth Amendment. I have also concluded that the defendants do not have standing to challenge the search of the vehicle's trunk. As such, defendants' "fruit of the poisonous tree" arguments must fail.

### IV. CONCLUSION

For the reasons set forth herein, defendants' objections (Doc. Nos. 69, 85) are **overruled**. I hereby **accept** Judge Scoles' report and recommendation (Doc. No. 56)

without modification.  Defendants' motions to suppress (Doc. Nos. 40, 43 and 47) are **denied**.

**IT IS SO ORDERED.**

**DATED** this 11th day of October, 2016.

_____
LEONARD T. STRAND
UNITED STATES DISTRICT JUDGE